Submitted on remand from the Oregon Supreme Court November 16, 1982, resubmitted In Banc May 2, affirmed June 13, reconsideration denied September 7, petition for review denied October 30, 1984 (298 Or 151)

## STATE OF OREGON,
*Respondent,*

*v.*

## DANIEL FLORES,
*Appellant.*

(10-81-05891; CA A22413; SC 28913)

685 P2d 999

Ernest E. Estes, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Christine L. Dickey, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

GILLETTE, J.

Buttler, J., concurring.

Young, J., concurring in part, dissenting in part.

## GILLETTE, J.

In this case involving criminal convictions for ex-convict in possession of a firearm and possession of a controlled substance, we are once again presented with an occasion to discuss an aspect of Oregon's developing state law of search and seizure. We previously applied federal law, including Oregon cases interpreting federal law, to affirm these convictions. *State v. Flores,* 58 Or App 437, 648 P2d 1328 (1982). The Supreme Court accepted review and remanded the case to us for reconsideration in light of Oregon constitutional principles announced in *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982). *State v. Flores,* 294 Or 77, 653 P2d 960 (1982). On remand, we look not only to *Caraher* but also to a later decision, *State v. Lowry,* 295 Or 337, 667 P2d 996 (1983), and to other relevant state constitutional principles and precedent, at least to the extent that we can divine them. We affirm.

### OREGON CONSTITUTIONAL SEARCH AND SEIZURE LAW

The Oregon Supreme Court's recent shift in direction on the use of the state constitution in criminal cases presents this court with difficult problems in its day-to-day decision-making, problems which we must face in this case. We are without recent state law precedents in many areas and are uncertain of the extent to which recent federal decisions may also express Oregon constitutional principles. We are therefore left to develop those principles with guidance only from a few recent Supreme Court cases and from that court's traditional approach to the development of search and seizure law. That approach, as we will see, includes such fluctuations, indecisiveness and ambiguity that it is of little help to us, while the recent cases prove, on analysis, to stand for little, as yet.

Before the mid-1960's, the Oregon Supreme Court construed only state constitutional provisions, because the federal Fourth Amendment did not apply to the states. *Wolf v. Colorado,* 338 US 25, 69 S Ct 1359, 93 L Ed 1782 (1949), *overruled in Mapp v. Ohio,* 367 US 643, 81 S Ct 1684, 6 L Ed 2d 1081 (1961), and in *Ker v. California,* 374 US 23, 83 S Ct 1623, 10 L Ed 2d 726 (1963); *see Barron v. Baltimore,* 32 US (7 Pet) 243, 8 L Ed 672 (1833). In determining what the Oregon Constitution required, the court frequently cited cases from

the federal system and from other states, finding precedents from other jurisdictions helpful but not binding. *See, e.g., State v. Duffy,* 135 Or 290, 295 P 953 (1931); *State v. Lee,* 120 Or 643, 253 P 533 (1927); *State v. Laundy,* 103 Or 443, 495-497, 204 P 958, 206 P 290 (1922). Although in a few instances it appeared to treat federal cases as controlling, *see State v. DeFord,* 120 Or 444, 250 P 220 (1926), the court generally kept the distinction between the two sovereigns and their separate constitutions clear, adopting federal principles when they seemed appropriate.

One example of the Oregon court's approach before the 1960's is its handling of the question of the exclusion of improperly obtained evidence from use in a criminal trial. The court first appeared to reject the exclusionary rule of *Weeks v. United States,* 232 US 383, 34 S Ct 341, 58 L Ed 652 (1914), in *State v. Ware,* 79 Or 367, 154 P 905, 155 P 364 (1916). Then, in *State v. Laundy, supra,* it appeared to adopt the rule, albeit by dictum, stating that it did so for the same reasons which commended it to the federal Supreme Court, not because it was bound to follow the federal lead. As the court undoubtedly knew, many state courts at that time had rejected *Weeks.* Yet, despite *Laundy,* the question of exclusion in fact—as opposed to an abstract solution—remained unresolved for another forty years. The original majority opinion in *State v. McDaniel,* 115 Or 187, 231 P 965, 237 P 373 (1925), expanded on the *Laundy* dictum and ordered suppression of evidence but, on rehearing, a different majority found the search good and treated suppression as an open question. The court refused to decide the question through 1959, *see State v. Hoover,* 219 Or 288, 347 P2d 69 (1959); *State v. Flynn,* 137 Or 8, 299 P 694, 300 P 1024 (1931), although trial courts had suppressed evidence as early as 1924 and continued to do so thereafter. *State v. DeFord, supra; State v. Lanegan,* 192 Or 691, 699, 236 P2d 438 (1951); *see also Elkins v. United States,* 364 US 206, 80 S Ct 1437, 4 L Ed 2d 1669 (1960) (evidence which Oregon state courts suppressed could not be used in federal prosecution if state officials obtained it in violation of Fourth Amendment standards); *see* Patterson, *A Case for Admitting in Evidence Liquor Illegally Seized,* 3 Or L Rev 334, 340 (1924); Note, *Evidence—Admissibility of Illegally Obtained Evidence—The Law in Oregon,* 39 Or L Rev 368 (1960). In

sum, the court avoided the issue by never finding a search invalid, at times straining hard to avoid doing so.

Only after *Mapp v. Ohio, supra,* which applied the federal exclusionary rule to the states, did the Oregon court, in *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962), unequivocally state that unconstitutionally obtained evidence should be suppressed, and not until *State v. Elkins,* 245 Or 279, 442 P2d 250 (1966), did it ever find a search improper and reverse a conviction for failure to suppress. Throughout the entire period before *Mapp* and *Ker v. California, supra,* it normally treated this issue, and all other search and seizure questions, under the Oregon Constitution alone, looking to other jurisdictions for guidance but not accepting their decisions as controlling.[1]

During that period, the court dealt with a number of major issues in search and seizure law. They included searches incident to arrest, *State v. McDaniel, supra; State v. Quartier,* 114 Or 657, 236 P 746 (1925); *State v. Laundy, supra; State v. McDaniel,* 39 Or 161, 65 P 520 (1901), and its permissible scope, *Keeler v. Myers,* 119 Or 517, 249 P 637 (1926); the requirements for a search warrant, *State v. Flynn, supra; Nally v. Richmond,* 105 Or 462, 209 P 871 (1922); *Smith v. McDuffie,* 72 Or 276, 142 P 558, 143 P 929 (1914); and what constitutes probable cause. *State v. Christensen,* 151 Or 529, 51 P2d 835 (1935); *State v. Duffy,* 135 Or 290, 295 P 953 (1931). To be sure, the specific holdings in most, if not all, of these cases, while generally consistent with federal and state law of the period, are significantly more generous concerning police authority than are post-1960 decisions based on federal law; the changes in federal law alone in the interim make it questionable whether the Oregon Supreme Court would still consider them good law under the Oregon Constitution.

Whatever their present status, however, the pre-*Mapp* and pre-*Ker* Oregon cases necessarily established an analysis of Article I, section 9, of the Oregon Constitution that was independent of the federal constitution. That independent analysis began breaking down soon after *Mapp* and

---

[1] The Supreme Court in *State v. Davis,* 295 Or 227, 233-237, 666 P2d 802 (1983), views the effect of the *State v. Laundy, supra,* dictum somewhat differently than we do. Whichever view is correct, it is clear that the court made its own decisions independent of the results reached in other jurisdictions.

*Ker,* as the Supreme Court, rather than continuing to develop the meaning of the Oregon Constitution, simply decided cases under the federal constitution. In *State v. Chinn, supra; State v. Krogness,* 238 Or 135, 388 P2d 120, *cert den* 377 US 992 (1964), and *State v. Elkins, supra,* the court relied primarily on state law, but thereafter it increasingly treated United States Supreme Court precedent not only as establishing the constitutional minima but also as stating the maximum extent of constitutional protection. Thus, the Oregon Constitution lost its independent significance at the very time of a major revamping of search and seizure law under the federal constitution.

There were occasional reminders in dissents that Oregon could act independently. In *State v. Chinn, supra,* which was clearly decided under the Oregon Constitution, Judge O'Connell opposed the broad scope the majority allowed for a search incident to arrest and urged that the Oregon court adopt the rule of *United States v. Trupiano,* 334 US 699, 68 S Ct 1229, 92 L Ed 1663 (1947), under the Oregon Constitution, despite its rejection in *United States v. Rabinowitz,* 339 US 56, 70 S Ct 430, 94 L Ed 653 (1953):

> "[W]e have our own constitution to interpret and in interpreting it we are not bound by the cases decided by the United States Supreme Court if we propose to afford our citizens a greater protection against unlawful search than that required in those cases." 231 Or at 288 (O'Connell, J., dissenting).

Judge O'Connell repeated that point in his dissent in *State v. McCoy,* 249 Or 160, 172, 437 P2d 734 (1968), a case which the majority decided primarily, if not exclusively, on federal grounds. Judge Sloan also argued in his dissent in *State v. Cartwright,* 246 Or 120, 147, 418 P2d 822 (1967), that Oregon could adopt different rules than the federal Supreme Court requires. It is not clear, however, whether he wished the court to construe the Oregon Constitution's limitations on police authority more strictly than the federal or to adopt an independent construction of the federal constitution. (The Oregon Supreme Court several times indicated its belief that it was not bound by the federal Supreme Court's construction of the Fourth Amendment, the last time in *State v. Florance,* 270 Or 169, 182, 527 P2d 1202 (1974). It apparently dropped this misconception only when the Supreme Court specifically

disapproved the *Florance* language in *Oregon v. Haas,* 420 US 714, 719 n 4, 95 S Ct 1215, 43 L Ed 2d 570 (1975).)

Despite Judge O'Connell's and Sloan's statements, and possibly as a result of its misconception of its authority in construing the federal constitution, by the late 1960's the basis of the Supreme Court's search and seizure decisions was often hazy. At times, as in *State v. McCoy, supra,* it relied solely on federal law. At other times, as in *State v. O'Neal,* 251 Or 163, 444 P2d 951 (1969), and *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969), it cited no constitutional provision whatsoever. It also, as in *State v. Keller,* 265 Or 622, 510 P2d 568 (1973), and *State v. Blackburn/Barber,* 266 Or 28, 511 P2d 381 (1973), cited both constitutions but made no effort to distinguish them or to provide a separate analysis of either. *Cf. State v. Atkinson,* 64 Or App 517, 669 P2d 343 (1983) (analyzing whether later federal precedents have undercut *Keller* and determining that it remains valid under the state constitution). In effect, the court treated searches and seizures as a generalized common law subject controlled by federal principles in which the state constitution has no independent role. The older state cases simply dropped from sight, along with any attempt to develop their principles in light of more recent constitutional formulations.

This movement away from the state constitution reached its climax in *State v. Florance, supra,* in which the court held that, in an attempt to provide one rule for law enforcement officers to follow, it would adopt the rule on searches incident to arrest of *United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973), as the law of Oregon. Thereafter, the court adopted other federal holdings, apparently as a matter of course. *See* cases cited in *State v. Caraher, supra,* 293 Or at 748; *State v. Nettles,* 287 Or 131, 135 n 2, 597 P2d 1243 (1979); *State v. Flores,* 280 Or 273, 570 P2d 965 (1977). While it continued in these cases to cite the state constitution, the court gave it no independent content and referred to it only as part of a rote incantation. At other times it cited only federal law in making its decisions, *see* cases cited in *State v. Caraher, supra,* 293 Or at 748-49 n 7. As Judges O'Connell and Sloan had opposed the movement away from the state constitution in the 1960's, the court's position in post-*Florance* cases provoked opposition from Judges Lent and Linde, *see* cases cited in *State v. Caraher, supra,* 293 Or at

750, but, until *Caraher* and *State v. Lowry, supra,* the *Florance* position appeared firm.[2] Now, the court has reversed its course, but the result of its previous treatment of the state constitution leaves us with no ready way to determine the law we are now to apply.

As a practical matter, search and seizure law under Article I, section 9, of the Oregon Constitution stopped developing in the 1960's, but search and seizure law in other jurisdictions has changed drastically since then. The Oregon court has referred to many of those changes in post-*Florance* cases, but it has not adopted them in what it apparently would now consider a principled fashion; it simply declared a certain federal rule to be the law of Oregon without further analysis. *See, e.g., State v. Nettles, supra,* 287 Or at 135 n 2. We might nevertheless assume that the rules that it adopted under the state constitution in the post-*Florance* cases remain the law of Oregon, because it claimed to construe the state constitution in adopting them. *Cf. State v. Atkinson, supra,* 64 Or App at 521-22 (*State v. Keller, supra,* a pre-*Florance* case, remains state law despite later United States Supreme Court cases casting doubt on its correctness under the federal constitution). However, the court in *State v. Caraher, supra,* and *State v. Lowry, supra,* did not simply abandon *Florance's* position that the state constitution should follow the federal; it also overruled *Florance's* specific holding on the issue in question and revived *State v. O'Neal, supra,* which *Florance* had overruled, as the law of Oregon. In so doing, it relied entirely on pre-*Florance* state constitutional cases. It thus appears that post-*Florance* cases in fact decided nothing under the Oregon Constitution and that the applicability in Oregon of the last 15 years' growth of federal search and seizure remains an open question. The Oregon court always treated federal cases respectfully, even if it chose not to adopt them, but, in part because of the controversial nature of recent federal decisions

---

[2] The post-*Florance* cases were often ambiguous. For example, in *State v. Quinn,* 290 Or 383, 390-392, 623 P2d 630 (1981), the court analyzed a search after citing both constitutions, but it relied only on cases decided under the federal constitution. Its action may indicate that post-*Florance* federal law cases also automatically determine the state constitution's reach, or that, in the particular case, the court decided to apply the federal rule under the state constitution, or that the court simply did not notice that the earlier cases did not cite the state constitution. The court in *Quinn* explicitly based its overturning of the death penalty on the state constitution, and we do not know why it was not equally clear in analyzing the search and seizure issues.

and in part because of its recent decisions, we cannot say that it will continue to do so rather than seeking an independent analysis in opinions of United States Supreme Court minorities, other state courts, or commentators. *Cf. State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983) (establishing an Oregon double jeopardy rule different from both the United States Supreme Court majority and minority).

The Supreme Court's treatment of *Florance,* and its failure to cite post-*Florance* cases in *Lowry* or *Caraher,* convinces us that it will treat post-*Florance* but pre-*Caraher* cases as federally-based and as deciding nothing under the Oregon Constitution, even when they purport to adopt a federal rule as the Oregon constitutional rule. We are thus returned to first principles, and what once appeared settled turns out not to be. For example, the impact of such cases as *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967) (the Fourth Amendment protects privacy interests, not property rights), and *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969) (limiting the scope of search incident to arrest) on Oregon search and seizure law remains to be determined. It is quite possible, for instance, that the Oregon court will decide to stick closer to the constitutional language than has the Supreme Court and will not follow the federal lead in *Katz* and its progeny in totally abandoning a property rationale for Article I, section 9. *See State v. Elkins, supra,* 245 Or at 288-89 (Art I, § 9, protects property rights as well as privacy rights).

It is also possible, as a result of the reliance on pre-*Florance* cases, that in some respects Oregon law may be less protective of an individual's rights than is federal law. *See State v. Kennedy, supra,* 295 Or at 270-71. If so, federal law will control, although the Supreme Court has not always carried through on this analysis. For example, in *State v. Caraher, supra,* the court relied primarily on the approach of *State v. Chinn, supra,* in determining that a search was proper as a search incident to an arrest under the Oregon Constitution. Yet the specific search that the *Chinn* court approved would clearly be impermissibly broad under *Chimel v. California, supra.* In *Caraher,* the court also cited *State v. Krogness, supra,* even though the search in that case was held to violate the federal constitution in a federal *habeas corpus* action soon after the state decision. *United States ex rel Krogness v.*

*Gladden,* 242 F Supp 499 (D Or 1965). It is particularly unclear, in the light of the state cases on which it relied, why the *Caraher* court, after upholding the search under Oregon law, failed to go on and evaluate the search under *federal* law— part of the methodology it should always follow if it finds no state constitutional violation and a federal constitutional violation is also asserted. *See State v. Kennedy, supra.*

In short, the Supreme Court has now told us to place the Oregon Constitution in a hothouse and force it to make up for years of stunted growth which that court caused. Because of the changes in federal law in those years, because of the Oregon court's history of looking to federal cases for guidance, and because the court in former years approved many searches it would not now approve, we cannot assume that pre-1970 Oregon cases remain the final word on the Oregon Constitution. Worse yet, we also cannot treat recent Oregon cases, even those which mention the state constitution, as controlling on the issue decided nor, given the court's clear desire to cut itself free from federal decisions it considers undesirable, can we rely on federal law for guidance. As one member of the court recently said, we must "[b]e prepared to think from scratch. Liberating ourselves from the reactive approach of the [U.S.] Supreme Court means liberating ourselves from many of the ways things have been done." Speech of Judge Linde to Conference of Chief Justices, *quoted in* 69 ABA Journal 1356 (1983). As another member of the court recently said, expressing the same thought, we now must make "a lonely journey in the dark of the moon and against the wind into the quagmire of the law of 'search and seizure * * *.' " *State v. Caraher, supra,* 293 Or at 760 (Campbell, J., concurring).

## CARAHER, LOWERY, AND WARRANTLESS SEARCHES

Our previous opinion sets forth the facts of this case; we will only supplement them as necessary. The challenged items are a plastic baggie containing marijuana that officer Costanza took from defendant's hand, a flowered cigarette purse and a leather change purse that he found in a brown paper bag on the seat next to the driver's position in the car and a gun that officer Keever found in a lidless container under some clothing on the back seat.

■ At the time of the seizure of the baggie, Costanza had only stopped defendant for a traffic violation. The warrantless search for and seizure of the baggie could not be incident to that stop or to any subsequent arrest related to the traffic violation; it required separate probable cause. *State v. Elkins, supra.* We therefore turn to a consideration of the probable cause which the state constitution and statutes require Costanza to have had in order to justify each step of this warrantless search.

We look first for guidance to the two cases in which the Oregon Supreme Court has recently addressed the subject of warrantless searches. In the first, *State v. Caraher, supra,* the court reaffirmed the doctrine that a person arrested for a crime may be searched incident to the arrest for evidence of that crime. 293 Or at 757-760; *see also State v. O'Neal, supra; State v. Krogness, supra.* In *State v. Lowry, supra,* it reaffirmed the requirement that a seizure of items found during a search incident to arrest have a justification independent of the arrest when the items seized are not related to the offense for which the defendant is under arrest. *See State v. Elkins, supra.* The court then went on to expand the warrant requirement in a way that we find difficult both to understand analytically and to apply practically.

In *Lowry,* the defendant, during a search after his arrest for driving under the influence of intoxicants, was found to possess a small, closed, transparent amber pill bottle containing a white powder that proved on analysis to be cocaine. The Supreme Court, in an extensive opinion, assumed that there was probable cause to seize the pill bottle but held that the subsequent testing was a separate search that was impermissible without a warrant. In doing so, it failed to note a well-established aspect of Oregon search and seizure law—one of the few—and appears to have extended the warrant requirement to situations where its only function will be to impede police investigations and to create busy work for judges.

The Supreme Court began its discussion in *Lowry* with a useful admonition:

> "The constitutional text [of Or Const, Art I, § 9] itself ties the phrase 'probable cause' to warrants. It seems never to become superfluous to repeat that the requirement of a

judicial warrant for a search or seizure is the rule and that authority to act on an officer's own assessment of probable cause without a warrant is justified only by one or another exception. * * *" 295 Or at 346.

The court then went on to note, at the conclusion of the same paragraph:

"* * * *The reasons for the exceptions from the rule are always one form or another of practical necessity to act before a warrant can be obtained.*" 295 Or at 347. (Emphasis supplied.)

■  This last sentence contributes to our puzzlement. It is not only "practical necessity" in the obvious sense of the phrase that justifies a warrantless search; arrest itself justifies such a search, so long as the search is for the protection of the officer or the preservation of evidence or is related to the crime for which the defendant was arrested and is reasonable in time, scope and manner. *State v. Caraher, supra,* and *State v. Chinn, supra,* establish this rule ineluctably. The first two purposes are matters of necessity, but the third is not. What *Lowry* fails to face squarely is that the search authorized in *Caraher* extends beyond the "necessary" to the merely reasonable. *See State v. Caraher, supra,* 293 Or at 759:

"These cases, *Chinn, Krogness* and *O'Neal,* have expanded the justification for a search incident to arrest beyond considerations of the officer's safety and destruction of evidence. They permit a search when it is relevant to the crime for which defendant is being arrested and so long as it is reasonable in light of all the facts. * * *"

In *Caraher,* the court approved a search of the defendant's purse that occurred while she was under arrest and locked in the back seat of a police car and the officer, with the purse, was sitting in the front seat. There was no "practical necessity" for that search. We cannot believe that *Lowry* was intended to overrule *Caraher sub silentio;* the opinion cites *Caraher* with approval several times and even, as noted, reiterates *Caraher's* holding. We therefore conclude that, by suggesting in *Lowry* that warrantless searches can be justified only by "practical necessity," the Supreme Court used the phrase in a technical sense, which we must now try to discern.

■  The phrase the Supreme Court used to describe the justification for a warrantless search was "practical necessity"

rather than the more common "exigent circumstances." We assume that it did so primarily to free itself from any technical glosses that may have been put on the latter term and to emphasize the need to look afresh at the practical situation facing the officer in deciding whether the officer, in the light of all the circumstances, should have sought a warrant rather than conduct an immediate search. Because two of the three justifications for a search incident to arrest (protection of the officer and preservation of evidence) are also matters of practical necessity, the phrase seems to apply there also. Inasmuch as the court apparently did not intend to alter its acceptance of the third justification (relatedness and reasonableness) either, we assume that the court also subsumed that justification under the "practical necessity" heading. That is, "practical necessity" in its technical meaning includes any search incident to arrest which meets the criteria of *State v. Caraher, supra,* and *State v. Chinn, supra.* While this conclusion may strain the Supreme Court's language, it is the only one which makes its holdings consistent.

■     This brings us to our second difficulty with *Lowry.* In order for a search to be incident to an arrest, the officer must have statutory authority to arrest the defendant, which means that the officer must have an arrest warrant or probable cause to believe that the arrestee has committed an offense. ORS 133.235; ORS 133.310. The crime for which the officer has probable cause need not be the crime for which the arrestee is ultimately charged or even the one for which the officer makes the arrest. *See State v. Cloman, supra,* 254 Or at 10-13; *State v. Krogness, supra,* 238 Or at 145-149. If a warrantless arrest is for a felony or a Class A misdemeanor, it is sufficient for the officer to have probable cause to believe that the arrestee committed it. If it is for a lesser offense, the officer must have probable cause to believe that the arrestee committed it in the officer's presence. ORS 133.310(1).

■     As the Supreme Court explained in *State v. Krogness, supra:*

> "Where the officer, without trespassing, sees contraband or other evidence reasonably causing him to believe that contraband is being transported or that some other crime is being committed in his presence, he may have probable cause to make an arrest for the newly discovered offense as well as for the traffic offense which initially brought the subject to

the attention of the officer. *In such a case, while there may be no distinct demarcation between the first and second arrests, there does exist, prior to any extensive search, a probable-cause foundation for an arrest for an offense more serious than a traffic violation. The officer then is justified in making such a search as may be commensurate with the gravity of the newly discovered situation. Probable cause to arrest for the more serious offense, when present, will answer constitutional objections to the rigor of the ensuing search. * * **

"* * * * *

"* * * If there is sufficient cause, as a matter of law, to justify whatever arrest is necessary physically to make a search, then a reasonable search is a lawful incident of such an arrest. * * *" 238 Or at 145-47. (Emphasis supplied.)

This concept of escalating probable cause is a principle familiar to virtually anyone with a speaking acquaintance with criminal constitutional law and has been part of Oregon law for almost 60 years. *State v. McDaniel, supra,* 115 Or at 240-242. Yet here, too, *Lowry*—if taken literally—raises havoc with the familiar.

*Lowry* was a case that escalated from a stop of the defendant's car on account of a faulty headlight to an arrest for driving under the influence of intoxicants to the discovery, seizure and subsequent analysis of a small, closed, transparent amber pill bottle containing a white powder. In that opinion, the Supreme Court said, touching on the subject of the inadvertent discovery of suspected contraband:

"In the course of a valid traffic stop of a vehicle or a permissible frisk incident to a stop or an arrest, officers sometimes may come upon other suspicious items. But these may not be seized on suspicion alone; probable cause is required. *State v. Elkins, supra,* found a constitutional violation in the seizure of pills in a pill bottle incident to an arrest for public drunkenness, because mere suspicion did not constitute probable cause for the officer to believe 'that the article he has discovered is contraband and therefore a crime is being committed.' 245 Or at 284. The state's brief in the present case proceeded on the premise that *State v. Elkins* had been overruled by *State v. Florance,* 270 Or 169, 527 P2d 1202 (1974), an assumption that the Court of Appeals properly rejected. The majority of that court nevertheless sustained the officer's action in retaining and opening the bottle and testing its contents, on the theory that the characteristics of the

bottle could cause a 'hypothetical reasonable officer' or 'an officer trained with respect to illegal drugs' reasonably to believe that the bottle contained contraband. 59 Or App at 344.

"We need not follow the Court of Appeals into judicial speculations on the extent to which contemporary culture has made pill bottles and containers of white powdery substances prima facie evidence of criminal possession of their contents and therefore subject to seizure. That question is of potential concern to people who carry a supply of baby powder, or table salt, or legitimate medicines, because *if observation of such a substance in an unconventional container suffices as probable cause to suspect possession of contraband, it also suffices as probable cause to arrest the person in whose possession the container is observed.* In the present case, however, the seizure of the bottle incident to a valid arrest and the subsequent testing of its contents are properly analyzed not as one but as two events. For 'probable cause' is not alone dispositive of both steps. The question is not simply whether probable cause to investigate, that is to say, to 'search,' the contents of the bottle did or did not exist, but whether there was any need to do so without a warrant." 295 Or at 345-46. (Footnote omitted; emphasis supplied.)

The Supreme Court then went on to decide that, assuming the officer had probable cause to believe that the amber bottle contained contraband and that the bottle's seizure was therefore proper, the subsequent testing of the bottle's contents was a separate, impermissible search, because the officers did not obtain a warrant authorizing the analysis. 295 Or at 346-349. The predicate for this conclusion is unclear. It may be that the officer who found the amber bottle had no special training or other articulated basis for believing he had discovered contraband and, thus, had no probable cause to seize the bottle. *State v. Elkins, supra.* That is the basis for the concurring opinion, but it does *not* explain the thrust of the court majority's analysis.[3] The court's language suggests, rather, that probable cause "is not alone dispositive of both [the seizure of the bottle and the testing of its contents]." 295 Or at 346.

---

[3] The concurring opinion noted,

"* * * [I]n the instant case[,] although the officer could observe the contents of the bottle without opening it, he failed to testify that he believed the contents of the bottle were illicit drugs. * * *" 295 Or at 358 (Jones, J., concurring).

It is at this point that the majority opinion in *Lowry* becomes inexplicable. With due respect to the Supreme Court, if the latter statement was meant to be a recitation of *existing* law, nothing could be more patently wrong. If the officer had probable cause to believe that what he had found was contraband, then he had probable cause to arrest defendant for possession of that contraband and the seizure was incident to the arrest for that offense. *State v. Caraher, supra.* The court danced around the probable cause issue throughout the opinion; it is a shame that it did not directly confront it.[4] It noted that there was a dispute whether the officer had "reasonable cause" to believe that the bottle contained contraband and then stated that, if he did, he would be entitled to retain the bottle long enough for a magistrate to determine if there was "probable cause" to seize and test the contents. The court made no effort to explain the distinction between "reasonable cause" and "probable cause," assuming that there is one. It ultimately held that the distinction between the case before it and *Caraher* is that, in *Caraher,* the item seized was related to the crime for which the defendant was arrested, while in *Lowry* it was not. 295 Or at 347. In order to make this distinction as to relatedness, however, the court had, at least, to assume that there *was* probable cause because, unless there was, the *seizure* was unlawful and the court had no justification for going on to the relatedness point it seems so desperately to have wanted to make. But there is the rub: If there was probable cause, there also was probable cause to arrest and the seizure and subsequent search were as much incident to the arrest as were those in *Caraher.*[5]

---

[4] It is even more of a shame when one considers the posture in which the case reached the Supreme Court. Although he had cited the Oregon Constitution, Article I, section 9, in his motion to suppress filed in the trial court, defendant, in *this* court, argued only *federal* constitutional theories. Likewise, in his petition for review, defendant cited only the Fourteenth Amendment. Neither the majority nor the dissenting opinion in this court mentions Article I, section 9. Appropriate respect for the appellate process—*see, e.g., State v. Hickmann,* 273 Or 358, 540 P2d 1406 (1975) (state as appellant before Supreme Court not entitled to urge theories for reversal not previously presented to the trial court)—could have avoided the problems *Lowry's* adventurous analysis creates.

[5] ORS 131.005(11) provides that "probable cause" means "that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." This definition appears to apply only to the probable cause necessary to arrest. It is likely that statutory probable cause is more stringent than is the constitutional probable cause justifing a search or seizure. It is possible that *Lowry* assumed sufficient probable cause to justify a search

The only possible distinctions we can find between *Lowry* and *Caraher* are that, in *Caraher*, the defendant challenged only the warrantless discovery of the contraband, not its subsequent testing, and that in *Lowry* there may not have been probable cause to justify the seizure. The majority refused to rely on the second possibility; we are left with the first, a weak reed indeed—an analytically untenable one, in fact, in view of the fact that this issue (among others) was not raised in *Lowry,* either.

Where, then, does *Lowry* leave us? We are unsure. However, the case's insistent reliance on both *Caraher* and *Elkins,* and its emphasis on the requirement of procuring a warrant as soon as possible, lead us to conclude that the court may have had two intentions: to reinstate, as a fixture of Oregon constitutional law, the principle of *State v. Elkins, supra,* and to place a gloss on that part of *State v. Chinn, supra,* which tests the validity of searches incident to arrest by the officer's opportunity to obtain a warrant.

The basic principle of *Elkins* is that an arrest allows only a limited search and that one of the limitations is that material seized must be related to the crime for which there is probable cause to arrest. In *Lowry,* the Supreme Court and both the majority and dissent in this court quoted *Elkins* on this point:

> "If the rule were otherwise, an officer who desired to inculpate an arrested person in another crime, could seize everything in such person's immediate possession and control upon the prospect that on further investigation some of it might prove to have been stolen or to be contraband. It would open the door to complete temporary confiscation of all an arrested person's property which was in his immediate possession and control at the time of his arrest for the purpose of minute examination of it in an effort to connect him with another crime. Such a practice would be as much an exploratory seizure as one made upon an arrest for which no probable cause existed. Intolerable invasions of a person's property rights would be invited by an *ex post facto* authorization of a seizure made on groundless suspicion." *State v. Elkins, supra,* 245 Or at 287-288; *quoted in State v. Lowry, supra,* 295 Or at

---

but not enough to justify an arrest. If so, the distinction from *Caraher* that it draws would make sense. However, there is nothing in the opinion to indicate that the court was aware of any such difference in probable cause standards, let alone relied on it.

348 and in *State v. Lowry,* 59 Or App 338, 341, 650 P2d 1062 (1982), and 59 Or App at 347 (Buttler, J., dissenting).

In *State v. Chinn, supra,* the Supreme Court stated criteria for evaluating the reasonableness of a search incident to an arrest; it reaffirmed those criteria in *State v. Caraher, supra,* 293 Or at 758. In doing so, however, the court in *Caraher* failed to mention the *Chinn* criterion that the officer's opportunity to obtain a warrant is relevant to the determination of the reasonableness of proceeding without a warrant. 231 Or at 268, 272-73. *Chinn* gave the criterion an uncertain weight; *Lowry* could be read to make it decisive, but *the absence of analytically defensible underpinnings and the tremendous ambiguity of its language leaves the matter in doubt.*

We shall not read *Lowry* as making an abstract opportunity to obtain a warrant dispositive under the present circumstances, for two reasons: First, we think it clear that, if that is what was intended, the majority could have said it. It did not. Second, we think that, had *Lowry* been meant to stand for such a proposition—that the seizure of contraband incident to lawful arrest nonetheless separately requires a warrant before that contraband can be tested—its incredible departure from traditional practice would have been made with greater candor and would have provoked a firestorm of dissent, not a concurrence. Third, such an approach is both impractical and of little protection to the person being searched. We recognize that the opportunity to seek a warrant now has greater significance in a search incident to arrest than it did previously and that, when a search reaches a logical stopping point the police must seek a warrant before proceeding further.[6] However, requiring officers to stop midway in a search like the present one, leave everyone in limbo, and seek a warrant would tend to benefit only the stationers who sell blank search warrant forms.

Reading *Caraher* and *Lowry* together in the manner described—which, given *Lowry's* anomalies, admittedly takes

---

[6] We note that officers may obtain a search warrant by telephone, thus reducing the disruption *Lowry* might otherwise create. ORS 133.545(4); ORS 133.555(3). The Washington Supreme Court has recently held, under that state's constitution, that the availability of a telephonic warrant is relevant to determining whether there are exigent circumstances justifying a warrantless search. *State v. Ringer,* 100 Wash 2d 686, 701-03, 674 P2d 1240 (1983).

some nerve—and keeping in mind pre-*Florance* cases, we conclude that there are two major exceptions to the warrant requirement of Article I, Section 9, of the Oregon Constitution: searches incident to an arrest, in which the relevant criteria are those of *Chinn* and *Caraher* as modified by *Lowry,* and searches supported by probable cause and "practical necessity" in its obvious meaning.

Searches incident to arrest are the primary justification for warrantless searches of the person. If the officer is without probable cause to arrest a person, the officer is without probable cause to search him, for a search of the person necessarily implies an arrest. The Supreme Court made that clear 20 years ago:

> "We believe, however, that the spirit of the constitutional proscription against unreasonable searches requires the same degree of good-faith belief in the guilt of a suspect to justify a search of his person or of his effects as would be required to support his arrest or an application for a warrant to search his home. As a practical matter, it is difficult to explain how the police can search an individual without arresting him, since any substantial detention without his consent would fit the definition of an arrest found in such criminal cases as *State v. Christensen,* 151 Or 529, [51 P2d 835 (1935)], and such civil cases as *Lukas v. J. C. Penney Co.,* 233 Or 345, 378 P2d 717 (1963). If there is sufficient cause, as a matter of law, to justify whatever arrest is necessary physically to make a search, then a reasonable search is a lawful incident of such an arrest. If there is not probable cause to arrest, there is no logical basis for saying that one may nevertheless be arrested on suspicion and detained long enough for the officers to search him to satisfy themselves that he is indeed as innocent as the law presumes him to be." *State v. Krogness, supra,* 238 Or at 146-47.

It thus appears that, under Oregon law, the search of a person or of property closely associated with the person at the time of the search generally is supportable only if there is probable cause to arrest. While a formal arrest may occur after the search, if at all, *Krogness* points out that the search itself implies an arrest.[7] *See also State v. Caraher, supra.*

---

[7] There is now a clear statutory definition of arrest in ORS 133.005(1):

"(1) 'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense. * * *"

Conversely, a search based on probable cause and practical necessity applies to situations such as that in *State v. Elk,* 249 Or 614, 439 P2d 1011 (1968), in which the officers found a deserted car in circumstances which gave them probable cause to believe that it contained stolen property. There was no one to arrest, but there were grounds for the search.[8]

## THE OREGON CONSTITUTION APPLIED TO THESE SEARCHES

We turn—at last—to the facts of this case. Costanza saw defendant run a stop sign at about 4:15 a.m. As soon as he turned on his overhead lights to stop the car, defendant quickly reached over to the passenger's side and then straightened up. Defendant continued driving for another 100 yards before stopping. During that time, he was constantly bobbing up and down, moving his head and arms in and out of the officer's sight. This was such unusual behavior for a driver in a traffic stop that Costanza felt concern for his own safety and called for a cover unit before leaving his vehicle to approach defendant.

Defendant continued making quick movements toward various places in the front seat of the vehicle while Costanza approached him and even after he had asked defendant for his driver's license and registration. Defendant shifted around, talked nervously and reached into a brown paper bag with his right hand, pulling out a small, folded, clear plastic baggie. Defendant attempted to hide it in his hand, but a small portion protruded and Costanza could see it. When

---

This definition is consistent with the court's position in *State v. Krogness, supra,* that there must be an arrest before there can be a search, because the restraint necessary for a search is, under the statute, an arrest. *See State v. McDaniel, supra,* 115 Or at 235-36 (because officers searched defendant without an arrest or search warrant, the justification for the search must be found in their right to arrest defendant for a crime committed or attempted to be committed in their presence).

[8] The concurring opinions of Judges O'Connell and Denecke in *State v. Elk, supra,* 249 Or at 624 (O'Connell, J., specially concurring), 249 Or at 625 (Denecke, J., specially concurring), which together had the support of a majority of the court, would base affirmance on this ground and constitute the holding of the court, rather than the putative majority opinion, which relies on a search incident to a later arrest. Other situations when probable cause and practical necessity might be relevant include when the person possessing the evidence is not the suspected criminal or when a search incident to arrest turns up evidence of an unrelated crime in a situation not giving grounds for an arrest for that crime. *See* n 5, *supra.*

defendant first tried to leave his car, he left the transmission in drive and the vehicle moved. Costanza had to tell him to stop and to put the vehicle in park. Defendant attempted to do so but only moved the transmission lever to reverse. When he got out, the car began backing up and Keever, who had just arrived in response to Costanza's request, jumped in and stopped it.

■ In short, defendant acted nervous, worried and not fully in control of himself. He was obviously trying to hide something that he had taken out of the brown paper bag and that something was, as Costanza could see, a plastic baggie. Costanza knew from his training and his previous experience that people often store marijuana in plastic baggies. The totality of these circumstances gave probable cause to believe that what defendant was hiding was a controlled substance and that it was most likely marijuana. That was sufficient probable cause to believe that defendant was committing the offense of possession of a controlled substance in Costanza's presence and, whether any formal arrest occurred then or later, defendant was in fact under arrest for that offense.[9] ORS 133.005(1). The search involved in Costanza taking the baggie from defendant was incident to that arrest. The trial court correctly refused to suppress the baggie.

■ The baggie contained a substance which Costanza recognized on sight as marijuana. He therefore continued to have probable cause to hold defendant.[10] In addition, he noticed that defendant's behavior appeared "strangely

---

[9] *Former* ORS 133.310(1) granted peace officers the authority to arrest if the officer had probable cause to believe the person had committed a felony or a Class A misdemeanor anywhere or was committing any other offense, other than a traffic infraction, in the officer's presence. That statute authorized an arrest on probable cause for the violation of possession of less than one ounce of marijuana, ORS 475.992(4)(f); such a violation is an offense, ORS 161.505. The extent of the permissible search incident to such an arrest might or might not be more limited than a search incident to an arrest for possession of a controlled substance of a more serious nature; because, in this, case the officers in their search incident to the arrest for the possession of marijuana found probable cause to believe that defendant was also in possession of amphetamines, we need not consider if the complete search could have been justified by the arrest for the violation. The 1983 legislature removed the authority to arrest for a violation. Or Laws 1983, ch 661, § 7 (*amending* ORS 133.310(1)). We do not need to decide how that change would affect our analysis.

[10] Of course, if Costanza had then recognized that the baggie contained an innocent substance, the probable cause to arrest defendant would have disappeared and the officers could have searched no further.

altered" from the normal and suspected that defendant was under the influence of some intoxicant. He then searched the front seat, including the brown paper bag from which he had seen defendant take the baggie; it was within easy reach. We hold that that search was reasonably related in time, scope and intensity to one of the offenses for which defendant was under arrest—possession of the marijuana. *See State v. O'Neal, supra; State v. Chinn, supra.*

In the bag, Costanza found a flowered cigarette purse and a leather change purse. After feeling them from the outside, he opened them and found containers with a white powder in them and drug user paraphernalia.[11] His activity in opening the two closed containers would probably not be permissible as an inventory of defendant's property resulting from the arrest. *See State v. Keller, supra.* However, when an arrest is for possession of contraband, a search of the person and the area within the immediate control of the person for evidence of that offense—including the opening of closed containers—is permissible. *State v. Caraher, supra; State v. Chinn, supra.* That is all that occurred here. The trial court did not err in refusing to suppress the bag, the flowered cigarette purse and its contents, or the leather change purse and its contents.[12]

Having found the powder, which they had probable cause to believe was a drug possession of which is a felony, ORS 475.992(4)(a), it was reasonable for the officers to believe that they might find more contraband in the rest of the

---

[11] Costanza asked defendant if the powder was heroin or cocaine, and defendant answered that it was "speed," which Costanza knew was slang for amphetamines. Defendant's statement came before he received *Miranda* warnings and, as a result, the trial court suppressed it. It was not proper to use it in determining the nature of the substance Costanza found. However, the other circumstances provided probable cause to believe that the powder was a controlled substance, although Costanza's guess as to which controlled sustance was incorrect. The fact that the cigarette purse and coin purse were closed containers does not require a different rule; it is only one factor to consider in applying the standards for evaluating a search incident to an arrest. We hold, under those standards, that the search of the purses was proper. The discovery of the marijuana made it reasonable to believe that the brown paper bag might contain further contraband, and the search was reasonable in scope and time.

[12] Defendant raises no issues concerning the subsequent *testing* of the powder, as distinguished from its seizure at the time of the arrest. *See United States v. Jacobsen,* 466 US ____, 104 S Ct 1652, 80 L Ed 2d 85, (1984). As already noted, we are not sure what *Lowry* means or would require concerning any such issue in this search incident to arrest context.

passenger compartment. We hold that defendant's arrest for that felony was a sufficient basis for this further search. As noted, searches incident to a lawful arrest must be scrutinized as to time, scope and intensity. *State v. Chinn, supra.* Here, we find nothing unreasonable in searching the passenger compartment for evidence of the felony for which defendant had just been arrested. Such a search was essentially contemporaneous to the arrest, was no more intrusive than was justified by the nature of the offense, and was no more extensive than the area within defendant's immediate control. *See State v. Caraher, supra.* The gun that led to the firearm charge was found during that search. Its seizure was appropriate.

Turning to consideration of defendant's claims under the federal constitution, we adhere to our former opinion.

Affirmed.

**BUTTLER, J.,** concurring.

Although I concur in the majority's holding in this case (68 Or App at 637-39) and with its historical analysis of the problems we have been directed to resolve, *State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983); *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982), I do not agree with much of the majority's discussion of *State v. Caraher, supra,* and *State v. Lowry,* 295 Or 337, 667 P2d 996 (1983).

In my opinion, this case presents a relatively straight-forward application of *Caraher,* and I agree with the majority's application of the principles set forth in that case. As I understand *Lowry,* however, its holding has nothing to do with this case, and I see no reason to flog that opinion publicly other than to permit the author of the majority to vent his disagreement with it. That reason, however, does not justify publishing the opinion as the opinion of this court, so I do not join in it.

I do not agree with the dissent's view that *Lowry* requires a warrant in this case. *Lowry* held that, although an item may be seized in a valid search incident to arrest, a further "search" of the contents of the seized container may

not be made without a warrant.[1] Here, the gun seized in the back seat of the automobile does not present that problem.

Accordingly, I concur separately.

**YOUNG, J.,** concurring in part and dissenting in part.

I concur in the majority's holding affirming defendant's drug-related convictions. The majority has, however, misapplied its analysis in approving the search of the back seat of defendant's car. That search resulted in the discovery of the gun, and I therefore dissent from the affirmance of the conviction for ex-convict in possession of a firearm.

The search of the front seat of defendant's car was incidental to his arrest for possession of marijuana and, after the discovery of the white powder, for felony possession of a controlled substance. After that search defendant was clearly going to be placed in custody, and the car would be impounded. In *State v. Chinn,* 231 Or 259, 373 P2d 392 (1962), the Supreme Court pointed out that one of the factors in evaluating the reasonableness of a search incident to arrest is whether the officers had an opportunity to obtain a warrant. I understand *State v. Lowry,* 295 Or 337, 667 P2d 996 (1983), to mean that this *Chinn* criterion is entitled to great weight and that a search incident to an arrest should be more strictly limited in its time, scope and intensity when it is possible to get a warrant. As the majority notes, "when a search reaches a logical stopping point the police must seek a warrant before proceeding further." 68 Or App at 634. After the search of the front seat the situation had come to rest, the search had reached a logical stopping point, and any further warrantless

---

[1]The majority here considers the only function of that warrant requirement to be "to impede police investigations and to create busy work for judges," 68 Or App at 627, and "to benefit only stationers who sell blank search warrant forms" 68 Or App at 634. Apparently for those reasons, at least in part, the majority states that *Lowry* does not stand for that proposition. 68 Or App at 628. It does, and I think the majority has overlooked the distinct possibility that the police may not have been able to obtain a warrant for want of probable cause to believe that the container contained contraband.

Concededly, the protection of constitutional rights, state or federal, takes time and may be inconvenient. That is nothing new; it is the price of liberty.

search was not "reasonable in light of all the facts." *State v. Caraher,* 293 Or 741, 759, 653 P2d 942 (1982).[1]

Although the search was not properly incident to an arrest, it may have been based on practical necessity, which, as the majority notes, seems in this context to mean probable cause and exigent circumstances. I have no doubt that there was probable cause for searching the back seat and, probably, for searching the entire car. However, neither the trial court nor this court should have been asked to make that decision'after'the search. The purpose of Article 1, section 9, of the Oregon Constitution is to ensure that a judge, not an officer, will determine whether there is probable cause for a search, and that the determination will occur *before* the search and thus *before* any possible violation of a person's constitutional rights. There was no practical necessity for an exception in this case. Defendant was going to jail. There was no one else to drive the car away. There is no evidence that it would have been difficult or impossible to obtain a warrant.[2] The officers could and should have done so. I therefore respectfully dissent.

Joseph, C.J., joins in this opinion, as does Newman, J., who has authorized me to state that he expressly disassociates himself from the majority's analysis of *State v. Lowry, supra.*

---

[1]The other *Chinn/Caraher* criteria also militate against continuing the search, which was becoming a generalized search of the vehicle rather than of the area immediately associated with defendant.

[2]Even if there had been greater urgency than appears in this record, the officers could have obtained a telephonic warrant. ORS 133.545(4), ORS 133.555(3). There are 15 circuit and district judges in Lane County, each of whom has authority to issue a warrant by telephone. *Cf. State v. Ringer,* 100 Wash 2d 686, 701-03, 674 P2d 1240, 1249 (1983) (availability of telephonic warrant is relevant to existence of exigent circumstances).